1
2
3
4
5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF WASHINGTON

7   BARBARA ANDERSON,                )
    MICHAEL BUFFAN, GAIL             )   No. CV-13-420-LRS
8   LEADEN, TRAVIS MAGERS,           )
    RHETT WEILEP, and LEIGH          )   **ORDER RE**
9   WILLIAM on behalf of themselves  )   **MOTION TO DISMISS**
    and all others similarly situated, )
10                                    )
            Plaintiffs,               )
11                                    )
                                      )
12        v.                          )
                                      )
13  TECK  METALS, LTD.,               )
    a Canadian corporation,           )
14                                    )
            Defendant.                )
15  _____ )

16        **BEFORE THE COURT** is Defendant's Motion To Dismiss Amended

17  Class Action Complaint (ECF No. 37).  Oral argument was heard on December 17,

18  2014.

19

20  **I.  12(b)(6) STANDARD**

21        A Fed. R. Civ. P. 12(b)(6) dismissal is proper only where there is either a

22  "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under

23  a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699

24  (9th Cir. 1990).  In reviewing a 12(b)(6) motion, the court must accept as true all

25  material allegations in the complaint, as well as reasonable inferences to be drawn

26  from such allegations.  *Mendocino Environmental Center v. Mendocino County*,

27  **ORDER RE**
28  **MOTION TO DISMISS-         1**

14 F.3d 457, 460 (9th Cir. 1994); *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).  The complaint must be construed in the light most favorable to the plaintiff.  *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  The sole issue raised by a 12(b)(6) motion is whether the facts pleaded, if established, would support a claim for relief; therefore, no matter how improbable those facts alleged are, they must be accepted as true for purposes of the motion.  *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S.Ct. 1827 (1989). The court need not, however, accept as true conclusory allegations or legal characterizations, nor need it accept unreasonable inferences or unwarranted deductions of fact.  *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1403 (9th Cir. 1996).  "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ."  *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007).   The factual allegations must allege a plausible claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1951 (2009).

## II.  STATUTE OF LIMITATIONS/DISCOVERY RULE

Defendant Teck Metals, Ltd. ("Teck") appears to concede, at least for the purposes of this motion, that a three year statue of limitations applies to all of Plaintiffs' claims (strict liability, nuisance and negligence) because they are based on personal injury.  RCW 4.16.080(2).  Teck contends "[i]t is apparent from the face of the [First Amended Class Action Complaint (ECF No. 28)] that all of Plaintiffs' claims have long since accrued and expired."  More specifically, Teck contends all of the claims accrued before December 19, 2010, which is three years from December 20, 2013, the date on which Plaintiffs filed their original Class

**ORDER RE**
**MOTION TO DISMISS-**        **2**

Action Complaint (ECF No. 1).

A statute of limitations defense, "if apparent from the face of the complaint," may properly be raised in a motion to dismiss. *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 119 (9th Cir. 1980). A dismissal motion, however, should be granted "only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Id*., quoting *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). "Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss . . . if equitable tolling is at issue." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1003-04 (9th Cir. 2006).

The "discovery rule" is a form of tolling. Under the discovery rule, the statute of limitations does not begin to run until a plaintiff discovers or reasonably could have discovered all the essential elements of the cause of action. *Allyn v. Boe*, 87 Wn.App. 722, 943 P.2d 364, 372 (1997). The discovery rule does not require knowledge of the existence of a legal cause of action itself, but merely knowledge of the facts necessary to establish elements of the claim. *Douchette v. Bethel Sch. Dist. No. 403*, 117 Wn.2d 805, 814, 818 P.2d 1362 (1991). In *Putz v. Golden*, 2010 WL 5071270 (W.D. Wash. 2010) at *13, the court found the plaintiffs' allegations were sufficient to withstand a motion to dismiss based on the statute of limitations, noting that "[f]urther discovery may reveal that the exceptions of equitable tolling or the discovery rule should not apply, but the court expresses no opinion regarding the proper outcome at this stage of the litigation."

While the factual allegations in the Amended Complaint here do not point to a specific date of "discovery' for any of the named Plaintiffs, this is not critical so long as the allegations are sufficient to establish a potential defense to the statute

**ORDER RE**
**MOTION TO DISMISS-** **3**

of limitations.  Plaintiffs are not required to allege, as maintained by Teck, "what previously unknown facts came to each individual's attention, when the facts were discovered, and how these facts supplied knowledge of elements of their claims that were previously unknown."

"A plaintiff is not required to negate an affirmative defense, such as the statute of limitations, in his complaint."  *Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003).  The statute of limitations "is rarely a good reason to dismiss under Rule 12(b)(6)," *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1030 (7th Cir. 2004), because "the question is only whether there is *any* set of facts that if proven would establish a defense to the statute of limitations." *Clark*, 318 F.3d at 768 (quoting *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 80 (7th Cir. 1992)).  A Rule 12(b)(6) challenge "which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is timebarred," except for the "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  The facts necessary to determine the applicability of the discovery rule must clearly appear on the face of the complaint.

It is not apparent from the face of the First Class Action Amended Complaint that all of Plaintiffs' claims have accrued and expired.  Therefore, resolution of whether the "discovery rule" applies to each claim should be based on evidence presented at summary judgment proceedings after discovery is completed or, if necessary, at trial.  A liberal reading of the allegations in the Amended Complaint, and particularly those at Paragraphs 40-44, reasonably suggests it was not until after 2010 that individuals residing in the Upper Columbia River Region (UCRR), or who once resided there, knew or had reason

**ORDER RE**
**MOTION TO DISMISS- 4**

to know that emissions from Teck's smelter could be responsible for their specific

health problems and that the same was susceptible of proof so that they had a legal

right to maintain an action against Teck.

## II. CAUSATION

Teck contends the Amended Complaint fails to allege any facts to establish

causation which is an essential element of all of the Plaintiffs' claims.  According

to Teck, "absent . . . from the Amended Complaint are essential factual links in the

causal chain between releases from the [Trail] Smelter and Plaintiffs' alleged

diseases."

Teck asserts that Plaintiffs' allegations regarding general causation are

insufficient because "[w]hile Plaintiffs have arguably alleged that certain

chemicals can cause certain diseases[1], they say nothing as to whether those

chemicals can cause diseases at the (as yet undisclosed) level they claim they were

exposed to as a result of living in the UCRR."  Teck does not cite any authority for

the proposition that a specific dose-response relationship must be alleged in order

to plausibly allege general causation (whether exposure to a substance for which

defendant is responsible is capable of causing a particular injury or condition in

the general population).  Indeed, as Plaintiffs note, Teck does not cite any

---

[1] See Paragraphs 45 and 46 of Amended Complaint:

> The Trail Smelter has released high volumes of toxins
> and hazardous substances that have made their way into
> the Northport (sic) and UCRR, including: aluminum,
> antimony, arsenic, cadmium, copper, lead, manganese,
> mercury, silica, sulfur dioxide, thallium, and zinc.

> These toxins are known to cause many diseases, including
> cancer, inflammatory bowel disease, neurological disease,
> respiratory disease, and endocrinological disorders, which
> also have been reported at elevated levels in the Northport area.

**ORDER RE
MOTION TO DISMISS-      5**

authority that such must be alleged in order to plausibly allege specific causation (whether exposure to an agent was responsible for a given individual's disease).

Even when it comes to proving specific causation, as opposed to merely pleading it, "it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community." *Henricksen v. ConocoPhillips Co.*, 605 F.Supp.2d 1142, 1157 (E.D. Wash. 2009). "While precise or exact information concerning dosage or the dose-response relationship is not always required, the boundaries of allowable expert testimony are not so wide as to permit an expert to testify as to specific causation without having any measurements of a plaintiff's exposure to the allegedly harmful substance." *Id*., citing *Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255, 264 (6th Cir. 2001). Again, however, it is necessary to offer measurement of a plaintiff's exposure at the proof stage (summary judgment or trial), not at the pleading stage.

Teck asserts that "[b]ecause Plaintiffs plead no specific facts about their own exposure to hazardous substances, they fail to provide a plausible basis . . . to conclude their injuries are fairly traceable to Teck." According to Teck, Plaintiffs fail to plead "what specific metals or chemicals each was exposed to personally, the means by which each was exposed, or in what quantities and the periods of time during which each was exposed." This level of specificity is not required in order to establish "plausibility" regarding specific causation. What Plaintiffs have alleged in their Amended Complaint is sufficient to state a plausible claim for specific causation.

Plaintiffs allege actual exposure to Teck emissions via the air pathway over significantly long periods of time. Accordingly, while there are no specific

**ORDER RE**
**MOTION TO DISMISS-**       **6**

allegations in the Amended Complaint about any of the Plaintiffs drinking river water or lake water, swimming in river or lake water, eating fish from the river or lakes, or eating vegetables from gardens they or others had in the UCRR, merely breathing the air in the UCRR for a prolonged period of time  was enough according to the Amended Complaint: 1) "Between 1921 and 2005, it is estimated that Teck also emitted 38,465 tons of zinc, 22,688 tons of lead, 1,225 tons of arsenic, 1,103 tons of cadmium, and 136 tons of mercury **into the air**" (Paragraph 22; emphasis added); 2) "Multiple studies have identified environmental exposure to mercury as a cause of inflammatory bowel disease.  Teck emitted 136 tons of mercury **into the air** from 1926-2005 . . . . The Washington Department of Ecology found elevated levels of mercury in the Northport area, **primarily attributed to airborne emissions by Teck**" (Paragraph 51; emphasis added); 3) All four Plaintiffs [Gail Leaden, Travis Magers, Rhett Weilep, and Leigh Williams] lived in the UCRR for significant portions of their lives before being diagnosed with Crohn's or ulcerative colitis" (Paragraph 56)[2]; 4) "Given the presence of elevated levels of mercury in the UCRR attributable to the Trail Smelter, the alarmingly large cluster of inflammatory bowel disease in the Northport area, and the absence of some of the most common other risk factors, and given the scientific studies linking inflammatory bowel disease to exposure to the materials emitted by Teck and deposited in the UCRR, the diseases of Plaintiffs Gail Leaden, Travis Magers, Rhett Weilep and Leigh Williams were

---

[2] See Paragraphs 12 through 15 specifying exactly how long each of them lived in the UCRR.  Lead Plaintiff Barbara Anderson, who was diagnosed with breast cancer, voluntarily dismissed her claims against Teck and is no longer a party to the litigation.  (ECF No. 32).

**ORDER RE**
**MOTION TO DISMISS-** **7**

caused by long-term exposure to Teck's emissions, particularly mercury" (Paragraph 57); 5) "Cadmium is emitted to soil, water, and **air** by non-ferrous metal mining and refining, manufacture and application of phosphate fertilizers. The highest risk of exposure comes from processes involving heating cadmium-containing materials such as smelting and electroplating.  The major route of exposure is through **inhalation** of dust and fumes or incidental ingestion from contaminated hands, food, or cigarettes" (Paragraph 60; emphasis added); 6) "Anywhere from 5-50% of the cadmium **inhaled** will enter the body through the lungs.  **Breathing** air contaminated with very high levels of cadmium can severely damage the lungs and may cause death.  **Breathing** even lower levels of cadmium over long periods of time (for years) results in a build-up of cadmium in the kidneys" (Paragraph 61; emphasis added); 7) If lead enters the body through **inhalation** of dust or chemicals that contain lead, it quickly enters other parts of the body through the bloodstream" (Paragraph 63); and 8) Teck emitted 22,688 tons of lead **into the atmosphere** between 1921 and 2005. . . . Teck emitted 1,103 tons of cadmium **into the atmosphere** between 1921 and 2005 . . . ." (Paragraph 68; emphasis added).

The court agrees with Plaintiffs that their action is on "all fours" with *Brown v. Whirlpool Corporation*, 996 F.Supp.2d 623 (N.D. Ohio 2014).  In that case, Whirlpool contended the plaintiffs did not plausibly allege its dumping and emitting practices proximately caused plaintiffs' injuries.  The district court disagreed:

> Viewed in the light most favorable to plaintiffs, the complaint alleges a plausible causal relationship between Whirlpool's alleged negligence and plaintiff's injuries.  In brief, plaintiffs have alleged that Whirlpool polluted the air and soil in and around Clyde over a period of at least fifty years.
>
> During that time, Whirlpool dumped carcinogens and other

**ORDER RE**
**MOTION TO DISMISS- 8**

hazardous materials at multiple sites throughout the Clyde area- a practice that "allowed many . . . pollutants . . . to blow through the wind . . . onto the citizens of Clyde and Eastern Sandusky County." . . . Moreover, the complaint alleges the soil surrounding the Clyde plant contained PCBs- a class of known carcinogens- at levels exceeding the relevant EPA safety threshold.  Although only one plaintiff alleges she visited a dump sites (sic)- Whirlpool Park, where high levels of PCBs were found as recently as 2012- the complaint adequately alleges a mechanism that could expose plaintiffs and others to Whirlpool's hazardous waste.

Furthermore, plaintiffs provide non-conclusory allegations that Whirlpool's airborne emissions exposed plaintiffs to carcinogens, VOCs [Volatile Organic Compounds], and other toxic substances.  Significantly, plaintiffs allege the Ohio EPA determined Whirlpool emitted "unacceptable levels" of benzene- a known carcinogen- and other chemicals from the Clyde plant in 2009 and 2010. . . .  In addition, plaintiffs allege Whirlpool emitted abnormally high levels of VOCs in 2005, after it switched to a new type of paint.

As a result of their exposure to those substances, plaintiffs allege they or their children developed cancers, disabilities, and other diseases.  Regarding the incidence of cancer, multiple government agencies have confirmed the existence of a cancer cluster in southeast Sandusky County, and one study identified only a low probability that the cluster could be explained by chance alone.

*Id*. at 637-38.

The allegations in *Whirlpool* bear a close resemblance to the allegations in the Amended Complaint: 1) Plaintiffs allege Teck has polluted the air and the soil and the water in the UCRR for approximately the past 100 years (Paragraphs 17-33); 2) the Environmental Protection Agency (EPA) and others have determined that Teck is the principal source of contamination in the area (Paragraphs 34-39); 3) an informal health survey indicates Northport residents suffer from thyroid or endocrine disorders at six times the rate of the general population and found elevated rates of arthritis, cancer, inflammatory bowel disease, brain aneurisms, and Parkinson's disease; and 4) a subsequent health survey conducted by Dr. Korzenik found 17 confirmed cases of either ulcerative colitis or Crohn's disease,

**ORDER RE**
**MOTION TO DISMISS-**          **9**

a cluster representing 10 to 15 times what would normally be seen in a population the size of Northport (Paragraphs 42-44).

Plaintiffs' Amended Complaint sets forth allegations plausibly establishing that Teck's emissions are the proximate cause of the diseases suffered by them. Proximate cause will be adjudicated based on the proof presented either at summary judgment or trial.

## III. ABNORMALLY DANGEROUS ACTIVITY/STRICT LIABILITY

Washington courts recognize the doctrine of strict liability as set forth in Restatement (Second) of Torts §§ 519 and 520 (1977).[3] "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he exercised the utmost care to prevent the harm." Restatement (Second) of Torts § 519(1)(1977). Whether an activity is "abnormally dangerous" is a question of law. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 6, 810 P.2d 917 (1991). Six factors are considered in determining whether an activity is abnormally dangerous**:**

> (a) existence of a high degree of risk of some harm to the person, land or chattel of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;

---

[3] With strict liability, unlike negligence, it is unnecessary to prove duty and breach of duty. Strict liability is "liability that is imposed on an actor apart from . . . a breach of duty to exercise reasonable care." *Prosser & Keeton on Torts*, §75 at 534 (5th ed. 1984).

**ORDER RE
MOTION TO DISMISS-        10**

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977).

Furthermore,

> [a]ny one of the [six factors] is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily. Because of the interplay of these factors, it is not possible to reduce abnormally dangerous activities to any definition. The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with reasonable care.

*Klein*, 117 Wn.2d at 7 (quoting Restatement (Second) of Torts § 520, cmt. f (1977).

The "Statement of Facts" section of Plaintiffs' Amended Complaint (Section IV) does not specifically address each of the six factors (i.e., does not specifically allege that lead/zinc smelting is not a matter of common usage and that it is inappropriate to the place where it is carried on). That is not fatal, however, because it is reasonable to infer from the alleged facts that one or more of the listed factors exist to support the conclusion as set forth in the strict liability claim for relief (Paragraph 108), that "[o]peration of the Trail Smelter constitutes an abnormally dangerous activity because Teck releases and has released hazardous and toxic substances, which create a high risk of significant harm."

Alleging a negligence claim (failure to exercise reasonable care) is not inconsistent with alleging a strict liability claim. Plaintiffs' strict liability claim asserts that even if Teck exercised reasonable care, it is still liable because it

**ORDER RE**
**MOTION TO DISMISS-        11**

engaged in an abnormally dangerous activity.  Plaintiff's negligence claim asserts that even if  Teck did not engage in an abnormally dangerous activity, it still failed to exercise reasonable care and should be held liable.  This distinction was explained in *Roeder v. Atlantic Richfield*, 2011 WL 4048515 (D. Nev. 2011) at *5:

> Strict liability applies when, and only when, the harm for which the plaintiff means to hold the defendant liable cannot have been prevented with due care.  In such cases, defendant is held strictly liable to pay for any harm resulting from the inevitable effects of his activity.  This is the nature of a strict liability claim as contradistinguished from a negligence claim.

*Roeder* was a class action arising out of alleged air and groundwater contamination by a mining company.  The mine site consisted of an abandoned copper mine and extraction facility in Nevada.  The companies who operated the mine from 1918 to 1982 extracted approximately 360 million tons of ore and debris from the open pit mine, much of which remained as waste in a "pit lake" and "tailings or leach heap piles."  Toxic substances at the mine site included arsenic, chromium, lead, mercury, uranium, thorium, and radium.  These substances had contaminated the local groundwater, surface water, soil, and air, leaving the plaintiffs exposed to them.  The district court declined to dismiss plaintiffs' strict liability claims, finding they were available under the factor-based approach of the Restatement (Second) of Torts:

> Open-pit copper mining likely had great value to the community and was likely appropriate to the areas of the Mine Site when it was ongoing, and open-pit copper mining may be common in Nevada (or may have been so during the relevant time period).  However, it was not likely a common activity for "many people in the community."  Moreover, open pit mining likely involves the use of many chemicals and the storage of many waste materials that will inevitably seep into the ground when stored in outdoor piles, as Plaintiffs allege, creating a high degree of risk of harm to people and land via heavy metals contamination.  The harm is likely to be great, causing serious health problems, such as

**ORDER RE**
**MOTION TO DISMISS-          12**

> cancer. Finally . . . the risk of such seepage cannot
> be eliminated through reasonable care. In order to be
> profitable, a mine must presumably create abnormally
> vast piles of waste that cannot reasonably be isolated
> from the surrounding air and soil. Whatever is in these
> waste piles will inevitably diffuse into the surrounding
> environment.

2011 WL 4048515 at *5.

The district judge in *Roeder* deemed the facts in his case most analogous to *State Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150 (1983), where the State of New Jersey sued various corporations that had carried on mercury processing operations at a site for almost fifty years. The lawsuit sought recovery for the cost of the cleanup and removal of mercury pollution seeping from a forty-acre tract of land into a creek, a tidal estuary of the Hackensack River flowing through the Meadowlands. Based on consideration of the Restatement (Second) factors, the Supreme Court of New Jersey affirmed the trial court's finding that the corporations had engaged in abnormally dangerous activity for which they could be held strictly liable:

> Pollution from toxic wastes that seeps onto the land of
> others and into streams necessarily harms the environment.
> [Citation omitted]. Determination of the magnitude of the
> damage includes recognition that the disposal of toxic waste
> may cause a variety of harms, including ground water
> contamination via leachate, surface water contamination
> via runoff or overflow, and poison via the food chain.
> [Citation omitted]. The lower courts found that each
> of those hazards was present as a result of the contamination
> of the entire tract. [Citation omitted]. Further, as was the
> case here, the waste dumped may react synergistically with
> elements in the environment, or other waste elements, to
> form an even more toxic compound. [Citation omitted].
> With respect to the ability to eliminate the risks involved
> in disposing of hazardous wastes by the exercise of
> reasonable care, no safe way exists to dispose of mercury
> by simply dumping it onto land or into water.
>
> The disposal of mercury is particularly inappropriate in
> the Hackensack Meadowlands, an environmentally sensitive
> area where the arterial waterways will disperse the pollution

**ORDER RE**
**MOTION TO DISMISS-**       **13**

through the entire ecosystem. Finally, the dumping of untreated
hazardous waste is a critical societal problem in New Jersey,
which the Environmental Protection Agency estimates is the
source of more hazardous waste than any other state. [Citation
omitted]. From the foregoing, we conclude that mercury
and other toxic wastes are "abnormally dangerous," and the
disposal of them, past or present, is an abnormally dangerous
activity. We recognize that one engaged in disposing of
toxic waste may be performing an activity that is of some use
to society. Nonetheless, "the unavoidable risk of harm that is
inherent in it requires that it be carried on at his peril, rather
than at the expense of the innocent person who suffers harm
as a result of it." *Restatement (Second)* [*of Torts* § 520],
comment h at 39.

*Id*. at 159-60.

The allegations of Plaintiffs' Amended Complaint bear many similarities to

the facts in *Roeder* and *Ventron*. Plaintiffs have alleged facts plausibly showing

that Teck's smelter operations are abnormally dangerous so as to withstand a Fed.

R. Civ. P. 12(b)(6) motion to dismiss. Whether those operations will ultimately be

deemed abnormally dangerous as a matter of law is a question which will be

determined based on evidence presented at summary judgment or trial.

## IV. FEDERAL COMMON LAW PUBLIC NUISANCE CLAIM

### A. Standing

Congress has not authorized courts to develop a substantive law of air or

water pollution and therefore, federal common law can only be fashioned if a

"federal rule of decision is 'necessary to protect uniquely federal interests.'"

*National Audubon Society v. Department of Water*, 869 F.2d 1196, 1202 (9th Cir.

1988), quoting *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630,

640, 101 S.Ct. 2061 (1980). A "'uniquely federal interest' exists 'only in such

narrow areas as those concerned with the rights and obligations of the United

States, interstate and international disputes implicating the conflicting rights of

**ORDER RE**
**MOTION TO DISMISS-      14**

states or our relations with foreign nations, and admiralty cases.'" *Id*., quoting *Texas Industries*, 451 U.S. at 641.

Teck contends *National Audubon Society* precludes the Plaintiffs who are "private" parties, as opposed to state entities, from pursuing a federal common law pubic nuisance claim. In *National Audubon Society*, the Ninth Circuit reversed the district court's conclusion that the plaintiff had stated a federal common law nuisance claim based on air pollution where it had accepted the plaintiff's allegations that dust storms polluted not only the air of California, but also that of Nevada. Based on its review of two Supreme Court decisions, *Georgia v. Tennessee Copper Company*, 206 U.S. 230, 27 S.Ct. 618 (1907), and *Illinois v. Milwaukee* ("*Milwaukee I*"), 406 U.S. 91, 92 S.Ct. 1385 (1972), both of which "involved a state suing sources outside its domain which were causing pollution within the state," 869 F.2d at 1205, the Ninth Circuit concluded as follows:

> The great similarity between these cases underscores the limited context in which the [Supreme] Court has been willing to recognize a federal common law nuisance claim based on air pollution due to an interstate dispute. It appears that the Court considers only those interstate controversies **which involve a state suing sources outside of its own territory because they are causing pollution within the state to be inappropriate for state law to control, and therefore subject to resolution according to federal common law.**
>
> Therefore, true interstate disputes require application of federal common law. [Citations omitted]. Because we conclude this is essentially a domestic dispute and therefore not the sort of interstate controversy which makes application of state law inappropriate, reliance on federal common law is unnecessary. Audubon cannot rely on the federal common law of nuisance to state its air pollution claim.
>
> Although we recognize that this case could develop into a dispute involving conflicting rights of States, that is not the case before court, and we do not decide legal questions based on contingencies, speculation or potential conflicts. [Citations omitted]. Because we

**ORDER RE**
**MOTION TO DISMISS-      15**

conclude that Audubon cannot properly assert a federal common law nuisance action based on air pollution **on these facts**, we need not decide whether or not such a cause of action would be preempted by the Clean Air Act, **or whether Audubon would have standing to assert this claim.**

*Id*. at 1205 (emphasis added).

*National Audubon Society* cannot be read for the proposition that only state entities can pursue a federal common law public nuisance claim. First of all, the Ninth Circuit made it explicitly clear that it was not going to address whether Audubon had standing to pursue such a claim as a private party. Secondly, the circuit's decision was narrowly limited to the particular facts of the case which the circuit concluded amounted to essentially an intrastate, domestic dispute. Those facts were the National Audubon Society suing the Los Angeles Department of Water and Power (DWP) for conditions at Mono Lake located in California. The federal nuisance claim was predicated on the assertion that Mono Lake was an "interstate or navigable" water in which there was an overriding federal interest, and that DWP's diversions of water to Los Angeles of four freshwater streams that would otherwise flow into Mono Lake were causing air pollution in the form of alkali dust storms from the newly exposed lake bed. The suit was brought in the Eastern District of California, the location of the source of the pollution (Mono Lake), against an entity based in California (the Los Angeles DWP). Arguably, California law was sufficient to address the source of the pollution in California and in the process, remedy both the air pollution in California and Nevada. Here, on the other hand, the source of the pollution is located outside the State of Washington (Teck's smelter in British Columbia) resulting in pollution inside the State of Washington. It is more in the way of an interstate dispute.

*///*

**ORDER RE
MOTION TO DISMISS-        16**

It appears that Judge Reinhardt in his dissenting opinion in *National Audubon Society*, 869 F.2d at 1210, thought the majority was limiting standing in federal common law nuisance actions to state complainants, a proposition with which he disagreed.  Nevertheless, he noted that "[w]hile the majority discusses the need for state plaintiffs at some length, ultimately it appears to base its holding on the fact this case involves only California parties." *Id*. at 1211.  *National Audubon Society* did not involve a dispute between parties from different states, unlike the dispute here between Teck, a Canadian corporation, and the Plaintiffs.

It is no wonder then that in *Native Village of Kivalina v. ExxonMobil Corporation*, 696 F.3d 849 (9th Cir. 2012), the Ninth Circuit did not address whether there was any consequence to the complainant not being a state entity. Indeed, there is no mention of *National Audubon Society* in *Kivalina*. Furthermore, in *Connecticut v. American Electric Power Company*, 582 F.3d 309, 365-66 (2nd Cir. 2009), in which the Second Circuit held that non-state entities could sue under the federal common law of nuisance, Judge Reinhardt's dissenting opinion in *National Audubon Society* was cited as support.  It is difficult to fathom that the Second Circuit (or any circuit court) would omit to mention the majority opinion in *National Audubon Society* if that opinion in fact held that non-state entities cannot sue under the federal common law of nuisance.

This court will not dismiss Plaintiffs' federal common law nuisance claims for lack of standing.  Assuming they do have standing, the next question is whether those claims are nonetheless precluded because Congress has displaced them through the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §9601 *et seq.*.

//

//

**ORDER RE**
**MOTION TO DISMISS-**          **17**

**B.  Displacement**

In *Kivalina*, the Ninth Circuit held that the Clean Air Act (CAA) and EPA action authorized by the CAA displaced plaintiffs' federal common law public nuisance claim for damages and affirmed the district court's dismissal of plaintiffs' action for lack of subject matter jurisdiction.  Here, Teck contends that CERCLA displaces Plaintiffs' federal common law public nuisance claims for damages.  No court has held whether CERCLA, by itself, is sufficient to displace a federal common law public nuisance claim for damages.

Claims can be brought under federal common law for public nuisance only when the courts are "compelled to consider the federal questions which cannot be answered from the federal statutes alone."  *Kivalina*, 696 F.3d at 856, quoting *City of Milwaukee v. Illinois* (*"Milwaukee II"*), 451 U.S. 304, 314, 101 S.Ct. 1784 (1981).  "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speak[s] directly to [the] question at issue."  *Id*. quoting *Connecticut v. Am. Elec. Power Co., Inc.*, _____ U.S. _____, 131 S.Ct. 2527, 2537 (2011) ("*AEP*").  "The existence of laws generally applicable to the question is not sufficient; the applicability of displacement is an issue-specific inquiry."  *Id*.   The question is "whether Congress has provided a sufficient legislative solution to the particular [issue] to warrant a conclusion that [the] legislation has occupied the field to the exclusion of federal common law."  *Id*. quoting *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 777 (7th Cir. 2011).

"[T]he Supreme Court has instructed that the type of remedy asserted is not relevant to the applicability of the doctrine of displacement."  *Kivalina*, 696 F.3d at 857, citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S.Ct. 2605 (2008), and *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n.*, 453

**ORDER RE**
**MOTION TO DISMISS-**          **18**

1  U.S. 1, 4, 101 S.Ct. 2615 (1981). "Under *Exxon* and *Middlesex*, displacement of a

2  federal common law right of action means displacement of remedies." *Id*. In

3  *Kivalina*, the Ninth Circuit held the *AEP* case "extinguished Kivalina's federal

4  common law public nuisance damage action, along with the federal common law

5  public nuisance abatement actions." *Id*. "Judicial power can afford no remedy

6  unless a right that is subject to that power is present." *Id*. Accordingly, the fact

7  CERCLA does not provide a damages remedy for personal injuries is irrelevant to

8  whether CERCLA displaces and precludes Plaintiffs' federal common law public

9  nuisance claims in the case at bar.

10       Plaintiffs assert the "question at issue" is "whether Teck can be held liable

11  for personal injuries caused by its contamination of the UCRR under the federal

12  common law of nuisance." According to Plaintiffs, "the legislative history of

13  CERCLA confirms that Congress rejected the inclusion of any statutory personal

14  injury provisions within CERCLA and thus did not intend to occupy the field of

15  personal injury liability caused by contaminants." This is too narrow a view of the

16  "question at issue" and essentially focuses on the available remedies which, as

17  noted above, is irrelevant. The "question at issue" is liability for the release and

18  threatened release of hazardous substances. This is the harm of which Plaintiffs

19  complain. Congress has spoken directly to this issue via CERCLA and has

20  provided a "sufficient legislative solution" to warrant a conclusion that CERCLA

21  occupies the field to the exclusion of federal common law. By way of CERCLA,

22  Congress has provided a comprehensive liability and remediation scheme to

23  address releases and threatened releases of hazardous substances by making

24  polluters strictly liable for response costs to clean up the hazardous substances,

25  and liable for natural resource damages to remedy harm to the environment for

26  which they are responsible. CERCLA was enacted to "provide for liability,

27
28  **ORDER RE**
    **MOTION TO DISMISS-**          **19**

compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *3550 Stevens Creek Associates v. Barclays Bank of California*, 915 F.2d 1355, 1357 (9th Cir. 1990), quoting Pub. L. No. 96-510, 94 Stat. 2767 (1980).

Plaintiffs' federal common law public nuisance claims have been displaced by CERCLA and therefore, must be dismissed.

## V.  STATE LAW PUBLIC NUISANCE CLAIM (RCW 7.48.120)

As an alternative to their federal common law public nuisance claims, the Plaintiffs plead state law public nuisance claims.  In Washington, a nuisance is "an unreasonable interference with another's use and enjoyment of property . . . ." *Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 592, 964 P.2d 1173 (1998). Nuisance "consists in unlawfully doing **an act**, or omitting to perform a duty, **which act** or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency . . . or in any way renders other persons insecure in life, or in the use of property."  RCW 7.48.120 (emphasis added).  The "acts" at issue here occurred in Canada (discharging slag from Teck's smelter into the river; emitting pollution from the stacks of Teck's smelter).  The allegations in Plaintiffs' Amended Complaint are consistent therewith:  "Teck's operation of the Trail Smelter is [a] nuisance."  (ECF No. 28 at Paragraph 117).

The court agrees with Teck that Plaintiffs seek to extraterritorially apply Washington's nuisance statute to Teck's activities in Canada.  No court has ever sanctioned such an extraterritorial application.  It is irrelevant that the Ninth Circuit Court of Appeals previously found in related environmental litigation that CERCLA is not being applied extraterritorially to Teck.  *Pakootas v. Teck*

**ORDER RE**
**MOTION TO DISMISS-      20**

*Cominco Metals, Ltd.*, 452 F.3d 1006 (9th Cir. 2006) ("*Pakootas I*")   CERCLA and Washington's public nuisance statute are distinct.  Liability under CERCLA depends on releases and threatened releases of hazardous substances.  Those releases occurred in Washington (from the UCR Site) and, as such, there is no extraterritorial application of CERCLA.  *Pakootas I*, 452 F.3d at 1074-75.

Under Washington law, nuisance can be based upon intentional, reckless, or negligent conduct.  *Hostetler v. Ward*, 41 Wn.App. 343, 357, 704 P.2d 1193 (1985).  It is possible for the same act to constitute negligence and also give rise to a nuisance.  *Peterson v. King County*, 45 Wn.2d 860, 863, 278 P.2d 774 (1954).  However, "[s]eparate legal theories based upon one set of facts constitute 'one claim' for relief under CR 54(b)."  *Snyder v. State*, 19 Wn.App. 631, 635, 577 P.2d 160 (1975).  "'[A] negligence claim presented in the garb of nuisance' need not be considered apart from the negligence claim."  *Atherton Condo. Apartment-Owners Ass'n Bd. of Dir. v. Blume Dev. Co.*, 115 Wn.2d 506, 527, 799 P.2d 250 (1990)(quoting *Hostetler*, 41 Wn.App. at 360.).  "In those situations where the alleged nuisance is the result of defendant's alleged negligent conduct, rules of negligence are applied."  *Id*. at 527.

Plaintiffs contend their state law public nuisance claims do not merge with their negligence claims because "[q]uite apart from the negligence which led to additional discharges . . . Plaintiffs' nuisance claim[s] arise[] from Teck's intentional discharge of toxins into the UCRR."  As Teck points out, however, merely alleging intentional conduct is not enough to prevent merging of a nuisance and a negligence claim.  "[N]uisance dependent upon negligence consists of anything lawfully but so negligently or carelessly done **or permitted** as to create a potential and unreasonable risk of harm which, in due course, results in injury to another."  *Hostetler*, 41 Wn.App. at 359.  (Emphasis added).  It is

**ORDER RE**
**MOTION TO DISMISS-**          **21**

necessary to allege tortious intent to prevent the merger of a nuisance and a negligence claim.  Tortious intent is found where "the actor desires to cause the consequences of his act, or . . . believes that the consequences are substantially certain to result from it."  Restatement (Second) of Torts § 8A (1965); *Bradley v. American Smelting and Refining Co.*, 104 Wn.2d 677, 682, 709 P.2d 782 (1985). See *Hurley v. Port Blakely Tree Farms, L.P.*, 2014 WL 2962806 (Wash App. Div. 1) at *7.

Plaintiffs' Amended Complaint certainly alleges intentional conduct on the part of Teck (intentionally discharging slag into the river; intentionally emitting chemicals into the air).  While it does not allege that Teck's smelting activities were unlawful or that Teck desired to cause the consequences of its intentional conduct, it alleges that Teck believed those consequences were substantially certain to follow from its intentional conduct.  According to Paragraph 8 of the Amended Complaint:

> Defendant has intentionally released millions of tons of toxins and hazardous chemicals into the atmosphere and the Columbia River, knowing that these toxins would contaminate the UCRR **and knowing or having reason to know that these substances would cause bodily injury to Plaintiffs and members of the proposed Class**.

(Emphasis added).

The court cannot conclude that Plaintiffs' nuisance claims are based on the same facts and allegations as their negligence claims such that the nuisance claims must be dismissed as duplicative.  Nevertheless, this is inconsequential because as discussed above, the state law public nuisance claims fail because Washington's public nuisance statute cannot be applied extraterritorially to Teck's smelting activities in Canada.

//

**ORDER RE MOTION TO DISMISS-      22**

## VI.  PERSONAL JURISDICTION

In determining whether a defendant purposefully directed activities toward a forum state, courts in the Ninth Circuit employ the "effects test."  *Mavrix Photo*, 647 F.3d 1218, 1228 (9th Cir. 2011).  "The 'effects' test which is based on the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), requires that 'the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Id*. (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)).

Teck contends Plaintiffs' Amended Complaint fails to allege that Teck "purposefully directed" its activities at the forum state (Washington) because the Amended Complaint does not allege that Teck caused harm to human health in Washington which it knew was likely to be suffered there (a "foreseeable" effect).  According to Teck, "[t]he Amended Complaint fails to allege any facts to support the necessary inference that Teck foresaw that its releases in Canada were likely to cause *harm to human health* in Washington."  This is inaccurate, as revealed by Paragraph 8 of Plaintiffs' Amended Complaint, quoted above, which was specifically pled in conjunction with Plaintiff's allegation in the same paragraph that "[t]he court's exercise of specific jurisdiction over Defendant is appropriate under the facts of this case."  The facts alleged in Paragraph 8 of the Amended Complaint, if true, are sufficient to establish personal jurisdiction.

Defendant's motion to dismiss tests only the Plaintiffs' theory of jurisdiction.  It attacks the face of Plaintiffs' Amended Complaint, rather than the underlying facts.  In evaluating the Plaintiffs' jurisdictional theory, the court need only determine whether the facts alleged, if true, are sufficient to establish

**ORDER RE**
**MOTION TO DISMISS-       23**

1  jurisdiction and no evidentiary hearing or factual determination is necessary.

2  *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 153 (2nd Cir.

3  1999).  In opposing a motion to dismiss on the papers, Plaintiffs need only make a

4  *prima facie* showing of jurisdictional facts to establish a basis for personal

5  jurisdiction, the uncontroverted allegations of the Amended Complaint must be

6  taken as true, and the court will draw all reasonable inferences in favor of

7  Plaintiffs.  *Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81,

8  84 (2nd Cir. 2013).  Plaintiffs have made this *prima facie* showing.

9      At this juncture, there is no basis for dismissing Plaintiffs' action for lack of

10 personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  Based on the evidence

11 presented at summary judgment or trial, the court may be required to revisit

12 whether Teck foresaw impacts to human health such that the exercise of personal

13 jurisdiction remains appropriate.

14

15 **VII.  CONCLUSION**

16      Defendant's Motion To Dismiss Amended Class Action Complaint (ECF

17 No. 37) is **GRANTED in part** and **DENIED in part** as set forth above.  It is

18 denied to the extent it seeks dismissal based on the statute of limitations, causation,

19 and personal jurisdiction.  Plaintiffs fail to state federal common law public

20 nuisance claims and state law public nuisance claims upon which relief can be

21 granted.  Those claims are **DISMISSED with prejudice**.

22 //

23 //

24 //

25 //

26 //

27
28 **ORDER RE**
   **MOTION TO DISMISS-        24**

**IT IS SO ORDERED**.  The District Court Executive is directed to enter this order and forward copies to counsel of record.  A notice shall be sent to counsel of record setting this matter for a telephonic scheduling conference.

**DATED** this ___5th___ day of January,  2015.

*s/Lonny R. Suko*

————————————————————
LONNY R. SUKO
Senior United States District Judge

**ORDER RE
MOTION TO DISMISS-**              **25**